Good morning. My name is Ron Ness. I turn on behalf of Mr. Orellana, the appellant. In this case, I raise two issues in my brief. I do not intend to discuss the first issue, but only focus my remarks on the second issue, which is the conviction for possession of The standard of review in this particular situation is de novo, and the appellate court is to take the evidence in light most favorable to the government in making their determination here. The case that I read that seems to address all of the issues that were raised at the And it appears that this court has indicated that in these situations where there is a finding of guilt for that particular charge, the appellate court will look to the facts of the case in determining whether or not there is a nexus between the possession and drug trafficking offense, which is, I guess, different than what the Fifth Circuit said in terms of how they view it. So here, what this Court has to do is, at least the way I read the case, is to look at the evidence and determine whether or not that supports the finding of guilt by any reasonable person in this case. Any reasonable juror, and when we reviewed de novo, we're looking to see whether a reasonable juror could look at this evidence and whether the judge improperly denied Rule 29. That's what we're reviewing, right? Yes. Okay. And if you look at the other cases that are discussed in Mosley, Krauss, Mann, and Rios, they all have different fact patterns. They all kind of go across the board as to what that fact pattern does in terms of relating the nexus between the possession of the firearm and the drug trafficking offense. In one case, the firearms were locked up in a vehicle. In the other case, the firearms were readily available as he entered into an apartment where, I believe it was Mosley that, maybe it was Krauss, but another case where it was obvious that the apartment or the residence was not actually a residence, it was just being used as a drug house, so to speak. Those aren't our facts, though. We've got a drug house. No, they're not. I'm just indicating some of the other facts. I think this presents a real close question for the Court as to whether or not these facts support. Why don't you tell us what your best facts are? What's your best facts? Well, the facts here are that the rifle that is the subject here. Why don't we call it an AK-47 with a .48 round clip? Now, if that's a rifle, it's an assault rifle. It's not a deer-hunting rifle unless he's a real bad shot. And so we're using an assault rifle with a .48 loaded, .48 round clip. Yes. That's what we have. And as indicated in the evidence, it was not an illegal weapon to start with. Okay. It's under the bed. It's under the bed. Okay. And is it the bed in his bedroom? The bed's in his bedroom. What else is in the bedroom? It's just a normal. There's no drugs found in the bedroom. It's a normal bedroom. Any drug paraphernalia, any records? That I read from the transcript. How big is the apartment? That I don't know, to be honest with the Court. I was not the trial counsel. I don't know. Well, I think the question is, is there anything on the record? Because some of these cases, it's a little apartment. You know, it's like 700 square feet. And I guess, do we know from the record anything about size? This obviously was a large enough apartment to be at least have one bedroom and a living room, kitchen, bathroom, which usually is 600 to 700 square feet. We were talking about studio apartments. Do you know any case that we have to rely on that would require us to go down to the inch size of the bedroom, the bed, the doorway? No. Okay. So now we've got a bedroom with an AK-47 under the bed. And it seemed to me there was some sort of a document in that bedroom. And as I understand the facts, it's not disputed that it was the defendant's bedroom. Yes, because of the document that was put into evidence that was taken out of the evidence. Yeah. It had his name on it, and he admitted that it was his bedroom. Okay. So that's out of the equation. And we've got drug paraphernalia in the apartment. In the living room. Right. Actually, it was on a small table. There was some small amount of meth in a tray and paraphernalia. And in the drawer in a dresser or in a cabinet in the living room, there was also a 9-millimeter handgun. You know, I see this as a close case. There is one thing here that distinguishes it from, I think, most of the other cases that we've looked at in this circuit and even other circuits, and that's the expert testimony on what kind of firearms are kind of weapons of choice for drug dealers, which include weapons of significant firepower and semi-automatic weapons. What, in your view, does that, how does that factor into the in furtherance analysis? I forget. It mostly talks about that. They talk about two things. They talk about, number one, possession is not enough. Number two, possession with that type of testimony is not enough. So the court has to go beyond that to make a determination, beyond just the mere fact that the weapon was possessed in the residence and the mere fact that there was expert testimony as to what drug dealers do in terms of. . . This is clearly, undisputedly a drug stash house, period. That's what it appears to be from the evidence, yes. Okay. So don't we start with that versus if it was in a residence and it was never identified as a drug house and just casual drug, but this is identified, I think, uncontested as a stash house. That's the only purpose. I think it was also identified as a residence. Well, he lives in California with his wife and five kids. He testified that he goes up here to this stash house to deal drugs, and he goes back and forth. So the purpose of this house is to deal drugs, to stash drugs. And there's an AK-47. Now, that seems to be a little bit off of a residence with a hunting rifle. Well, that's different, obviously, and that's why it makes it a close call. There's no question about that. But when I say residence, you know, people have more than one residence one way or the other. There's no question it was used as a drug stash house. But it's not a vacation home. Well, it depends on your definition of vacation. Well, even if he slept there, you could have a business with a deli up front and sleep in the back. It's still a deli, and it could be a residence. This purpose was a stash house. That's the main purpose, true. There's no denying that. I don't know how you differentiate necessarily between a straight residence and a place somebody stays while they're using a legitimate or illegitimate business. If you have a gun under the bed and it is an assault rifle with a 48-round magazine and you've got drugs in there, what's the conclusion that we use from our case law? And as Judge McKeown pointed out, the firepower of that rifle is trying to protect the stash house and the inventory. Well, that's obviously an obvious conclusion. I think there's other explanations or possibilities, I guess you could put it. I mean, I think that really comes – maybe you put your finger on it. It could be that he has other things going and he's worried about some other business dealings, for example. But the question then gets turned around to the burden, and that is, given this evidence, could any reasonable juror make that conclusion? And not every reasonable jury, but any reasonable juror. So it seems to me what you just said is, well, there's other explanations, which is true. But doesn't that in and of itself say that this is not an unreasonable conclusion by a juror? The – that's – I can't – you know, I can't argue with that. The way I look at it is, if this weapon was to be used in furtherance of drug trade, why was it in such an inaccessible place under the bed? That doesn't make – to me, that doesn't make any sense. Well, although you could say, in a way, it's the most accessible place, because he may think of himself as most vulnerable when he's sleeping. That's another argument. But I think the other case that says that the weapons that were readily accessible as you entered into the apartment or the residence was one of the major factors. I'm out of time. Do you want to save your time? We'll give you some rebuttal time. That's fine. We'll save it. Thank you. All right. Good morning, Your Honors, and may it please the Court. I'm Assistant United States Attorney Michael Bion on behalf of the United States. I think Your Honors have properly framed the issue here. The question is, viewing the evidence in the light most favorable to the government, could any rational juror find that there was a nexus, a connection, between that loaded AK-47 and Oriana's drug deal? And again, I think Your Honors have properly zeroed in on one of the important questions here, which is, what is Oriana doing in this house? All the evidence, the undisputed evidence in the record, showed that it was a stash house, a base for his drug operations. He lived in California with his family. He made periodic trips back and forth between California and Vancouver, and Vancouver was where he dealt his meth, and he dealt a lot of meth. He admitted that in the 18 months he'd been dealing, meth with a street value of at least $1.2 million passed through that house. At the time he's arrested, he's got two pounds of meth in the house with a street value of about $50,000. The only other person living with him in that house is his co-conspirator, who lives in another room down the hall. He's got his packaging equipment in there. He's got his drug ledgers in there. Even the furniture in the house, he admitted that he got it in trade for drugs. So if the defense here is that a juror could have found that he has the gun for some legitimate purpose, well, what is there? What is the legitimate purpose? His only reason for being in Washington is to deal drugs. Everything about that house is connected to his drug dealing business. What legitimate interest does he even have to protect in Washington? I think given the nature of the house alone, combine that with the type of weapon we're talking about, I think that right there is enough for a rational juror to find a nexus between the gun and his drug dealing. But there was more than that. There's another gun in the house. There's the loaded 9mm that's in the living room, along with the paint tray and the small amount of methamphetamine. And when you look at the two guns and you consider the evidence in the totality, you see that they're strategic weapons. Well, if you wander down that 9mm pistol, we can open that door, but then that raises another question because you have two people living in the house. The AK-47 is under Ariana's bed, but she's got his driver in the other bedroom. We could argue that the pistol could have belonged to either of them, and you'd dismiss that because you didn't have enough second charts to substantiate anyway. The question in my mind, if you want to argue that to support the rifle, I'd have a little harder problem with that. I think what's the authority for saying that the jury can consider the second gun when trying to justify the first gun as far as in connection with the drugs? I can't point you to a specific case that says that they can. Would you urge us to go down that road? I don't see a reason why the Court couldn't consider it if it chose to or why the jury couldn't consider it. It's one of the circumstances. It's one of the factors. It's one of the facts that the jury knew about that I think is relevant. But I also think that the placement of the AK-47 alone is important. I disagree respectfully with Mr. Ness that it's inaccessible. It's right there under the bed. If he hears a noise in the middle of the night, he thinks something's going on. He has access in a matter of moments. You know, even if you were to concede, which I don't think you need to. I think you need to concede the disquestionable. But even if you were to concede that the pistol belonged to the other guy, period, and it was his, I don't think it's totally irrelevant because if you've got a loaded pistol in the living room of Stash House, that's pretty good evidence that that one was being used in furtherance of a drug crime, maybe not by him but by somebody else, and that then may set up a pattern from which we might infer the use of the assault rifle under the bed that clearly does belong to him. I think that's right. And even if the other pistol belonged to the other man in the house, a jury certainly could have inferred that Oriana, who was the renter of the house and the lead person in the conspiracy, knew that that gun was there and that that gun was available to him if he needed to get to it. So whether he owned it or not, he had access. I think the evidence of that. Well, access is not the same as possession. So I'm with Judge Bonetti on this, and I'm not sure I want to say that that one's his for purposes of your argument. I'm not sure you need to go there in that fashion. It does make the inference, though, that drugs in the living room with a loaded 9-millimeter pistol next to them is an indicator that that drug was there to protect or accessible for protecting the drugs. But I think that's right, Your Honor. And it's true that the bulk of the drugs and the drug packaging equipment are in a different room across the hall. This circuit has made clear that there's no absolute rule that the drugs and the gun be in the same room. I think another important thing here is to put this evidence in the context of the expert testimony. And actually in the Mosley case, this Court said that evidence of possession alone, supplemented with expert testimony, does present at least a borderline case. I think we have a lot more here, but I think Mosley suggests that the possession plus the expert testimony alone may be enough to get it to the jury. Here we go far beyond that. The expert testimony here really gives important context to the facts that the jury talked about. The expert talked about drug dealers commonly possessing weapons to protect their drugs and drug proceeds. The DEA agent also testified about strategic placement. He talked about how they often have guns in their bedrooms. And he talked about the kind of guns that the drug dealers like to have. And he said they like to have these high-caliber, high-capacity magazines, high-firepower weapons. All those facts link all those, all that expert testimony links up directly with the facts of this case. And that was another important basis that the jury could look to in finding that there was a sufficient connection, a sufficient nexus between the gun and Oriana's drug business. And I think when you look at the sort of continuum of cases that Mr. Ness talked about, with Mosley and then Mann and Rios, I think this falls much closer on the Mosley side of the line than the Mann and Rios side of the line. Those were cases where, you know, in Mann, the gun was very hard to get to if the drug dealer needed it. That's not the situation here at all. It's right there under the bed. He can easily get to it. Mosley is a very similar case. We're talking about a stash house. The guns are not found in the same room with the drugs. Some of the guns are loaded. All these factors that you see that are very similar to the situation we have here. I think when you look at the evidence in the totality, given the nature of Oriana's business in Washington, the kind of weapon we're talking about, where it is, the expert testimony, there was enough evidence there for this issue to go to the jury and for a rational jury to find a nexus between the gun and Oriana's drug business. Thank you. If you have any other questions, thank you very much. Did you want rebuttal, Mr. Ness? Thank you. The case just argued, United States v. Oriana, is submitted.
judges: Brunetti, McKeown, W. Fletcher